[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14065
_____

D. C. Docket No. 9:10-cv-80644-KLR

ANDREA MIYAHIRA, et al.,
individually and on behalf of all others similarly situated,

Plaintiffs,

MONTGOMERY COUNTY EMPLOYEES' RETIREMENT FUND,

Plaintiff-Appellant,

versus

VITACOST.COM, INC.,
IRA P. KERKER,
RICHARD P. SMITH,
STEWART GITLER,
ALLEN S. JOSEPHS, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 6, 2013)

Before DUBINA, Chief Judge, BARKETT and KLEINFELD,[*] Circuit Judges.

DUBINA, Chief Judge:

This is a securities case. Appellants allege Appellees made material misstatements and omissions in an IPO Registration Statement and prospectus (collectively "the prospectus") for a September 2009 public offering of stock in violation of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"). Appellants are persons who purchased the stock. Appellees are the company that issued the stock, Vitacost.com, Inc. ("Vitacost"), the underwriters for the offering, Jeffries & Co., Inc., Oppenheimer & Co., Inc., Needham & Co., LLC, and Roth Capital Partners LLC (collectively "underwriters"), as well as certain officers and directors of Vitacost, Ira P. Kerker ("Kerker"), Allen S. Josephs, Lawrence A. Pabst, Richard P. Smith, and Robert G. Trapp (collectively "individual Appellees"). The district court granted Appellees' motion to dismiss for failure to state a claim under the Securities Act. After reviewing the record, reading the parties' briefs, and having the benefit of oral argument, we affirm the judgment of the district court.

## I. BACKGROUND

### A. *Pre-IPO Facts*

---

[*] Honorable Andrew J. Kleinfeld, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

According to the second amended complaint, in 1993, Wayne Gorsek ("Gorsek") founded Vitacost, a manufacturer and internet retailer of vitamins and nutritional supplements. [1]   By 2006, Vitacost had been one of the fastest growing, privately-held companies for five consecutive years.  As a result, Gorsek began exploring the possibility of taking Vitacost public.  NASDAQ indicated it would not permit a public offering of Vitacost's stock with Gorsek as CEO because of a 1999 SEC civil action involving an unrelated public relations firm Gorsek owned.  As a result, in January 2007, Gorsek resigned as CEO and handed the position to Kerker, Vitacost's general counsel.  After resigning, Gorsek became Vitacost's Chief Operations Architect.  This position carried no policy-making authority, but Gorsek continued to attend management meetings, advise the board of directors, and develop new proprietary products.

In order to boost interest in a public offering, Vitacost decided to begin manufacturing its proprietary products.  Historically, Vitacost had sold some proprietary formulations of supplements—most of which Gorsek developed—but the supplements were manufactured by third parties, which limited Vitacost's profit margin.  Transitioning to manufacturing would yield higher profit margins and make the company more attractive to investors.  Accordingly, Vitacost began

---

[1] Originally, Vitacost began operations under the name "Nature's Wealth Company."  It also originally did not offer its products over the internet.

3

construction of a manufacturing facility in Lexington, North Carolina.  The facility

was operational by April 2008 and dually served as Vitacost's east coast

distribution center.  Vitacost also maintained a west coast distribution center in Las

Vegas, Nevada.  Several months prior to the IPO, Vitacost decided to relocate the

Las Vegas facility and began searching for new space for the relocation.  [*See* R.

87 ¶ 72 (stating that "[Confidential Witness] #10[2] confirmed that [Vitacost] had

been searching for a new space to relocate the Las Vegas distribution facility," and

"the decision to relocate the Las Vegas distribution center had been made prior to

the IPO").][3]

In March 2008, Eigerwand Bjornstad ("Bjornstad") was hired as Vice

President of Manufacturing after having served as a consultant to Vitacost in 2007.

His main job was to build the manufacturing side of the business.  He immediately

helped boost Vitacost's manufacturing operation and earned an award for being the

"Employee of the Year" in 2008.  During his tenure, less than 1% of Vitacost's

proprietary products were out of stock at any given time.   Confidential Witnesses

#1, #6, #9, and #10 confirmed that Bjornstad was "largely responsible for building

Vitacost's manufacturing operation into a success."  [*Id.* ¶¶ 44, 47.]  Thus, Gorsek

developed most of the proprietary products, up to 300 a year, and Bjornstad

---

[2] Confidential Witness #10 is Gorsek.
[3] There is no allegation Vitacost had already selected the new space for the relocation.

4

oversaw the manufacturing facility to ensure the concepts made it to the shelves. By June 30, 2009, just before the IPO, Vitacost's customer base had grown to 957,000 customers, up from 270,000 customers in 2005.

In July 2009, "Kerker told [Confidential Witness] #3 that Gorsek and Bjornstad were 'short timers' who would soon be gone from Vitacost." [R. 87 ¶ 55.]  However, "Gorsek had no intention of leaving Vitacost after the IPO.  Gorsek spent 15 years building [Vitacost] and wanted to grow it into a billion dollar enterprise." [*Id.* ¶ 54.]  Kerker also told Confidential Witness #3 that "he planned to terminate Bjornstad as soon as Vitacost reported its 3Q:09 numbers." [*Id.* ¶ 56.]

## B. *The Prospectus*

On September 24, 2009, in accordance with SEC regulations, Vitacost filed its prospectus.  The document explained the company's business structure, products, future growth strategy, projected earnings, relevant key personnel, the impact of various government regulations, and variables that could adversely impact projected growth.

The prospectus described the roles of the officers and directors of Vitacost, such as Bjornstad, and it also described Gorsek's role in detail:

> *Wayne F. Gorsek* is our founder and, since July 2008, has served as our Chief Operations Architect.  As Chief Operations Architect, Mr. Gorsek works with our marketing, distribution, manufacturing, customer service and information technology departments to further

5

our business plan.  In June 2009, Mr. Gorsek's board-approved responsibilities were limited to assisting us with our marketing, distribution, manufacturing, customer service and information technology departments in an effort to further our business plan, and no longer include the exercise of policy-making authority.  From January 2007 to July 2008, Mr. Gorsek served as a full time consultant pursuant to a consulting agreement.  Since our inception in 1994 to January 2007, Mr. Gorsek served as our Chief Executive Officer and was a member of our board of directors.  Mr. Gorsek founded Vitacost.com (originally named Nature's Wealth Company) in 1994.  He has developed knowledge of the nutritional supplement business through reading of scientific literature and dialogue with our scientific advisory board and has conceptualized and implemented many of the products sold by us today.

[R. 65-1 at 34.]

The prospectus made clear that Gorsek did not exercise policy-making authority and that, in fact, if Vitacost permitted Gorsek "to act as one of [its] executive officers or directors without the consent of The NASDAQ Stock Market, including through the exercise of policy-making authority," its shares could be delisted which could materially reduce the liquidity and price of its shares.  [*Id.* at 6.]  The prospectus also warned that there was no assurance that Vitacost would "be able to operate as successfully as in the past without his management leadership, which could have a material adverse effect on our business, financial condition or results of operations." [*Id.*]

As to the role of Bjornstad, the prospectus stated:

6

*Eigerwand Bjornstad* has served as our Vice President Manufacturing since March 2008. From 2007 to 2008, Mr. Bjornstad served as a consultant of ours. From 1996 to 2007, Mr. Bjornstad served as an Operations Manager for Jarrow Industries where he provided management during the construction and implementation of a state of the art manufacturing facility and directed all aspects of manufacturing operations. Mr. Bjornstad has over 19 years of manufacturing leadership in the nutritional supplement industry.

[R. 87 ¶ 102.]

The prospectus warned that the departure of any key personnel could adversely impact Vitacost's business. Indeed, it stated:

Our success depends to a significant degree upon the continued contributions of our executive officers and other key personnel. Although we have employment agreements with our executive officers, we cannot guarantee that such persons will remain affiliated with us. If any of our key personnel were to cease their affiliation with us, our operating results could suffer.

[R. 65-1 at 6.] The prospectus did not disclose that any key personnel—including Gorsek and Bjornstad—would be leaving the company shortly after the IPO.

The prospectus also addressed the potential risks involved in its growth and expansion plan, which was geared toward eventually manufacturing all products that it sold and expanding its distribution to meet increased customer demand. Specifically, it explained that "[t]o the extent we continue to grow revenue it may be necessary and cost-effective to open a third distribution facility and/or expand

7

the footprint of one or both of the current distribution facilities." [*Id.* at 18.] It

also stated:

> Within the next 12 to 18 months, we anticipate that we will require
> additional space to expand our distribution platform and, within
> approximately six months thereafter, we will require additional space
> to expand our manufacturing capabilities. There can be no assurances
> that we will locate and secure such additional space on terms that are
> favorable to us or in locations that will facilitate our growth strategy.
> Our failure to do so could result in increased expenses or otherwise
> delay or limit our ability to implement our growth strategy which
> could have a material adverse effect on our business, financial
> condition or results of operations.

[*Id.* at 7.] However, the prospectus claimed that it was "anticipated that the

start-up and transition costs to open a third distribution facility would be

offset by the benefits of lower shipping costs and improved order fulfillment

turnaround." [*Id.* at 18.]

With regard to FDA regulations, the prospectus explained that "[c]omplying

with new and existing government regulation, both in the U.S. and abroad, could

significantly increase our costs and limit our ability to manufacture our products."

[*Id.* at 10.] It also warned that:

> The FDA may also determine that certain advertising and promotional
> claims, statements or activities are not in compliance with applicable
> laws and regulations and may determine that a particular statement is
> an unacceptable drug claim or an unauthorized version of a food or
> dietary supplement "health claim." Failure to comply with FDA or
> other regulatory requirements could prevent us from marketing

8

particular dietary supplement products or subject us to administrative, civil or criminal penalties.

[*Id.*]

Finally, the prospectus made several claims about anticipated and expected growth. The prospectus stated that Vitacost had "designed a growth strategy that [it] believe[d would] increase net sales while maintaining or increasing [its] gross margins." [*Id.* at 21.] This "plan [was] to use the proceeds of [the IPO] to further enhance [Vitacost's] manufacturing capabilities by purchasing equipment that allows [Vitacost] to manufacture powders, liquids and softgel products," in addition to the capsules and tablets it could currently manufacture, "as well as to expand [Vitacost's] packaging options to include individual dose blister packaging." [*Id.* at 22.] Essentially, the prospectus claimed that Vitacost would continue to grow its business by aggressively expanding its manufacturing efforts, which would result in higher gross margins for the company and allow Vitacost to effectively compete against other industry leaders.

However, the prospectus also warned that Vitacost's "actual results [could] differ materially from the forward-looking statements [that] are set forth in this prospectus." [*Id.* at 14.] It included and explained various risk factors, including "difficulty expanding our manufacturing and distribution facilities," "costs of compliance and our failure to comply with government regulations," and

9

"disruptions in our manufacturing system." [*Id.*] It cautioned investors not to "place undue reliance on [its] forward-looking statements" and that it could not "guarantee future results, levels of activity, performance or achievements." [*Id.*]

### C. *Post-IPO Facts*

According to the second amended complaint, "two days after the IPO, Kerker had instructed company managers and high level employees not to speak with Gorsek." [R. 87 ¶ 57.] Additionally, "Gorsek was prevented from attending management meetings the Monday after the IPO, which he had formerly attended regularly." [*Id.*] Kerker also instructed employees to stop sending Gorsek the documents and information he needed to do his job as Chief Operations Architect. Confidential Witness #10 said "it was clear that Kerker was attempting to force Gorsek out of the Company immediately upon completion of the IPO by, among other things, making it impossible for Gorsek to perform his duties." [*Id.* ¶ 58.] On December 7, 2009, Kerker fired Gorsek and "then caused [Vitacost] to issue a press release stating that Gorsek had 'retired' without [his] consent." [*Id.*] A few days later, as confirmed by Confidential Witness #6, Kerker also terminated Bjornstad.

"[I]n December 2009, [Vitacost officials] were summoned to an FDA Regional office." [*Id.* ¶ 96.] Confidential Witness #2 stated that the meeting was

10

to instruct Vitacost to review and change product labels that made prohibited health claims.  As a result, Vitacost had to remove an internet blog discussing its products' health benefits, and all customer service personnel had to participate in FDA training concerning permissible and prohibited representations about Vitacost products.  Previously, in 2005, the FDA sent Vitacost a letter instructing it to take down claims on its website that four specific products were "intended for use in the cure, mitigation, treatment, or prevention of disease."  [R. 87-1 at 2.]  There is no indication in the second amended complaint that this meeting was in reference to the same products Vitacost had been warned about in 2005.

On November 13, 2009, Vitacost announced in its required Form 8-K filing that it had executed a lease for a new distribution facility in Las Vegas on November 6, 2009.  The lease had an effective date of September 30, 2009.  Originally, Vitacost planned to relocate its distribution facility from the old facility to the newly-leased facility by December 2009.  However, according to Confidential Witness #7, "the relocation did not get fully underway until some point in March 2010 and was not completed until April 2010."  [R. 87 ¶ 78.]  In the interim, Vitacost operated both facilities at once and ran promotions to avoid moving inventory to the new distribution center.  The new facility had systemic

11

problems fulfilling customer orders and managing inventory. This led to high error rates, order backlogs, and significant operational issues.

Eventually, the effects of the turnover of personnel and manufacturing and distribution problems began taking a toll on Vitacost's bottom line. On April 20, 2010, Vitacost disclosed a manufacturing and logistics issue with its North Carolina facility. Thereafter, from April 20 to April 22 the company's stock price fell from $12.56 per share to $9.47 per share. On May 6, 2010, Vitacost disclosed that it had approximately $1.2 million in cancelled orders during the first quarter of 2010 due to the continued manufacturing and distribution problems. On July 30, 2010, Vitacost released a report stating that it was revising its projected earnings for the first quarter from $.14 to $.15 per share to a loss of $.04 to $.06 per share. In August 2010, the company's stock price fell to $7.25 per share and for a time Vitacost was delisted from NASDAQ.

## II. PROCEDURAL HISTORY

Individual Plaintiff-Appellant Andrea Miyahira initially filed this lawsuit on May 24, 2010, in the Southern District of Florida. On October 18, 2010, the district court appointed Montgomery County Employees' Retirement Fund as lead plaintiff. Appellants filed a consolidated amended complaint on February 15, 2011, against Appellees, as well as Vitacost's auditor, McGladrey & Pullen, LLP,

and certain individuals, Eran Ezra, Stewart Gitler, and David Ilfeld.  The consolidated amended complaint alleged Securities Act claims, as well as claims for violation of the Securities Exchange Act of 1934 (the "Exchange Act").  On April 28, 2011, Appellants voluntarily dismissed the claims against McGladrey & Pullen, LLP.  On December 12, 2011, the district court granted Appellees' motion to dismiss in its entirety with leave to amend.

Appellants filed a second amended complaint—the complaint at issue in this appeal—on January 11, 2012, and solely alleged violations of the Securities Act. The second amended complaint included new allegations based on information from confidential witnesses.  It alleged violations of § 11 of the Securities Act by Vitacost, the underwriters, and the individual Appellees, violations of § 12(a)(2) of the Securities Act by the underwriters, and violations of § 15 of the Securities Act by the individual Appellees.  On June 25, 2012, the district court granted Appellees' motion to dismiss without leave to amend.  It found that Appellants' allegations were essentially of corporate mismanagement, and that Appellants failed to plausibly allege that the statements made in the prospectus were false when made, or that the facts not disclosed were material to a reasonable investor. Appellants timely filed a notice of appeal on July 23, 2012.

While Appellants' second amended complaint alleges a laundry list of misstatements and omissions, Appellants challenge just four categories of alleged misstatements on appeal:  (1) the planned terminations of Gorsek and Bjornstad; (2) the plan to relocate the Las Vegas distribution facility; (3) Vitacost's ongoing violation of FDA regulations; and (4) statements about Vitacost's projected growth and growth strategy.

## III.  STANDARD OF REVIEW

Rule 12(b)(6) motions to dismiss are reviewed *de novo*.  *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1305 (11th Cir. 2009). We construe the second amended complaint in the light most favorable to Appellants, accepting all well-pleaded facts that are alleged therein to be true.  *See Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328 (11th Cir. 2006).  "To survive . . . a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  The plausibility standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability.  *Twombly,* 550 U.S. at 556, 127 S. Ct. at 1965.

14

## IV.  DISCUSSION[4]

Section 11 of the Securities Act creates a private cause of action where a registration statement, which includes a prospectus like the one at issue in this case, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  It extends liability to the issuer, the issuer's directors, the underwriters of the offering, and any accountants who prepared or certified the registration statement.  Section 12(a)(2) of the Securities Act similarly creates a private cause of action against persons who offer or sell a security "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading."  *Id.* § 77*l*(a)(2).  Unlike § 11, § 12(a)(2) imposes liability for material misrepresentations or omissions in any "prospectus or oral communication" used to solicit the sale of a registered security and reaches anyone who transfers title to the security and who successfully solicits a purchase.

[4] On appeal, Appellees contend the district court improperly analyzed the Securities Act claims under Federal Rule of Civil Procedure 8, rather than the heightened Rule 9(b) standard. Because Appellants' claims fail under the less stringent standard, we need not decide the issue. Similarly, Appellants contend the district court erred in evaluating the confidential witness testimony under the same standard applied to Exchange Act cases such as *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008).  Appellants argue the testimony should be accorded its "full weight," [Appellants' Br. at 34 n.5 (quoting *In re Thornburg Mortg., Inc.*, 683 F. Supp. 2d 1236, 1243 n.7 (D.N.M. 2010)], as with other categories of witnesses.  Again, because Appellants' claims fail however the testimony is evaluated, we need not decide the issue.

*See Pinter v. Dahl*, 486 U.S. 622, 641–46, 108 S. Ct. 2063, 2075–78 (1988); *see also* § 77*l*(a)(2).

In connection with the alleged omissions at issue in this case, in order to state a claim, Appellants must plausibly allege:  (1) the prospectus contained an omission; (2) the omission was material; (3) Appellees had a duty to disclose the material information; and (4) the information existed at the time the prospectus became effective.  *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002).

"[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S. Ct. 978, 983 (1988) (internal quotation marks omitted).  Thus, the test of materiality is ultimately an objective one.  *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012).  However, the trier of fact usually decides the issue of materiality, and the test of materiality "requires delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts." *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004) (internal quotation marks omitted).  "Only if the lack of importance of the omission is so plain that reasonable minds cannot

16

differ thereabout is it proper for the court to pronounce the omission immaterial as a matter of law." *Oxford*, 297 F.3d at 1189.

Additionally, under the Private Securities Litigation Reform Act's safe harbor provision, forward-looking statements "accompanied by meaningful cautionary statements" explaining the risks that may preclude a forward-looking projection from coming to fruition are immaterial as a matter of law. 15 U.S.C. § 78u-5(c)(1)(A). This is the statutory equivalent of the "bespeaks caution doctrine."

Because Appellants fail to plausibly allege a material misstatement or omission in the prospectus, each of their claims fails.

## A.  *Terminations of Gorsek and Bjornstad*

Appellants argue the omission of the pending terminations of Vitacost's founder and manufacturing vice president was material. They contend a reasonable investor would have wanted to know Gorsek and Bjornstad would be terminated shortly after the IPO. They point to Vitacost's significant manufacturing and logistical challenges that occurred after their departures, as well as the significant drop in the stock price by August 2010, as evidence that Gorsek and Bjornstad were pivotal to Vitacost's business. They also cite testimony from Vitacost employees that Gorsek and Bjornstad were vital to the company's success.

17

Conversely, Appellees argue Gorsek's departure could not have been material to a reasonable investor because investors were told in detail that Gorsek was prohibited from having a policy-making role in the company unless and until NASDAQ lifted the restrictions on his involvement. Given the other information in the prospectus describing both individuals' roles with the company—which Appellants do not challenge as false or misleading—a reasonable investor would not have viewed their departures as significantly altering the total mix of information.

Assuming Appellants have plausibly alleged Vitacost planned to terminate Gorsek and Bjornstad before the IPO, their claim nonetheless fails because the omission was immaterial as a matter of law. Appellants' strategy of demonstrating materiality by pointing to the opinions of those inside the company that Gorsek and Bjornstad were pivotal to Vitacost's success and by pointing to the eventual drop in Vitacost's stock due to the continued manufacturing and distribution issues is misguided. The issue is whether, given the information required to be provided to investors before the IPO, investors would have viewed Gorsek and Bjornstad's impending departures as material to their investment decision. Given that investors were told before the IPO that Gorsek was prohibited from having the same policy-making role he had previously as CEO, no reasonable investor could

18

have viewed his departure as significantly altering the total mix of information available. If anything, any loss to the company's future prospects due to a lack of input from Gorsek occurred when he stepped down as CEO, and investors adjusted their expectations accordingly. Similarly, there is nothing in the prospectus to suggest that Bjornstad was critical to the success of the company's manufacturing arm; thus, investors had no reason to think that without him the company would not continue to be successful. Thus, we hold the prospectus was not misleading in this respect.

### B. *Plans for New Distribution Facility*

Appellants claim the prospectus was materially misleading about Vitacost's true plans for a new distribution facility. They point to statements from Confidential Witnesses #1 and #10 that the company was searching for new space prior to the IPO and that it had made a decision to relocate the Las Vegas distribution center prior to the IPO. Yet, the prospectus stated that Vitacost expected it would remain in the existing Las Vegas facility for 12–18 months and would thereafter either expand that facility or add a third facility.[5] And on

---

[5] Appellants make much of the prospectus's claim that the "costs to open a *third* distribution facility would be offset by the benefits of lower shipping costs and improved order fulfillment turnaround." [Appellants' Br. at 43 (citing R. 87 at 111).] They say this shows that Appellees were misleading investors into thinking they would be adding a new facility, "perhaps in the middle of the country," rather than relocating the Las Vegas facility. [*Id.*] But the prospectus already discusses the prospect of expanding the old facility or adding a new facility.

19

November 13, 2009, approximately two months after the IPO, Vitacost executed a lease for a new facility with an effective date of September 30, 2009.

But the prospectus did not guarantee Vitacost would remain in its current facilities for 12–18 months. And without an allegation that Appellees knew Vitacost would locate, or had already located, a new facility and when the relocation would occur, there is nothing false or misleading about the prospectus. The fact that Vitacost began looking for space over a year before it expected to need it simply shows the company's foresight. Thus, we hold that Appellants failed to plausibly plead a material misstatement or omission with regard to the new distribution facility.

## C. *Violations of FDA Regulations*

Appellants' claim regarding alleged undisclosed violations of FDA labeling regulations also fails because the prospectus does not contain an omission or misleading statement about FDA violations. Appellants attempt to link the 2005 letter instructing Vitacost to remove health-related claims in connection with four specific products it offered for sale on its website to the December 2009 instruction to review its product labels to ensure FDA compliance. Appellants seem to imply

---

And while it may be somewhat misleading to not include the possibility of relocation, a reasonable investor would not have viewed that distinction as material. Regardless of its label, Vitacost had already disclosed that it would need to invest in its distribution facilities as demand for its products grew, and it stated that it would need to do this within 12–18 months.

20

that by virtue of being notified that four specific products needed to be re-labeled in 2005, Vitacost had knowledge that it was not in compliance with regard to other, unrelated products in 2009. We hold that this stretch in logic does not plausibly plead facts demonstrating that the prospectus's statements about FDA compliance contained material omissions.

D. *False Claims About Growth Projections and Growth Strategy*

Appellants' final claim is that Vitacost's statements about its future projected growth and growth strategy were misleading because it must have known with the expected departures of Gorsek and Bjornstad, the relocation of the Las Vegas distribution center, and the violations of FDA regulations that its projections were not realistic. Appellants' claim fails because its allegations essentially amount to a claim of corporate mismanagement. That Vitacost apparently misjudged its prospects for successfully relocating the Las Vegas distribution facility and managing the company without Gorsek and Bjornstad does not make its forward-looking projections actionable under §§ 11 and 12(a)(2). The prospectus contains appropriate cautionary language about the risks and uncertain variables that could impact its projections, including the impact of moving its facilities and the departure of key personnel. Thus, Appellees are protected by the safe harbor provision in 15 U.S.C. § 78u-5(c)(1)(A). Second, as stated above,

21

there are no plausible allegations that Vitacost knew or should have known it was not in compliance with FDA regulations before the IPO, and thus, it could not have known the eventual instruction from the FDA to re-label certain products would materially impact the company's projections. Therefore, we hold that Appellants have failed to plausibly plead any material misstatements or omissions regarding Vitacost's growth projections and growth strategy.

Thus, we conclude that the district court properly dismissed each of Appellants' §§ 11 and 12(a)(2) claims. Because Appellants failed to plausibly allege a violation of §§ 11 or 12(a)(2) of the Securities Act, they necessarily failed to plausibly allege a violation of § 15 as well. *See* 15 U.S.C. § 77*o* (imposing joint and several liability upon controlling persons for acts committed by individuals under their control who themselves violate §§ 11 or 12); *see also Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) ("Because Plaintiffs have failed to establish a primary violation under §§ 11 or 12, their § 15 claim also fails.").

## V. CONCLUSION

For the foregoing reasons, the judgment of dismissal is affirmed.

**AFFIRMED.**

22