DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MARK SPANAKOS,**
Appellant,

v.

**HAWK SYSTEMS, INC.,** et al.,
Appellees.

No. 4D22-1717

[April 19, 2023]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Glenn Kelley and Bradley Harper, Judges; Case No. 502010CA017971.

Manuel Arthur Mesa of Mesa LLP, Miami, for appellant.

Stuart H. Singer and Sashi C. Bach of Boies Schiller Flexner LLP, Fort Lauderdale, for appellees Greenberg Traurig, LLP, Bruce Rosetto and Amy Quintana.

GROSS, J.

Mark Spanakos appeals from a final judgment in favor of Greenberg Traurig, LLP, for attorney's fees and costs totaling $1,259,470.86, plus post-judgment interest.  We affirm.

### *Background*

Spanakos is a shareholder and former director of Hawk Systems, Inc., a now-defunct Delaware corporation that provided technology for starting automobiles using an authorized fingerprint.  According to Spanakos, Hawk Systems "generated approximately $22,000,000 in expenses while reporting sales of $5,575."

Spanakos sought repayment from Hawk Systems of a $1.5 million loan he had made to a predecessor company.  Spanakos claimed that the loan was secured by Hawk Systems' patents.  In addition, Spanakos alleged that other directors had embezzled money from the company and were engaged in a "pump and dump" scheme.

In early 2009, shortly after going public, Hawk Systems retained the law firm Greenberg Traurig, LLP ("Greenberg" or "the law firm").  Greenberg provided legal counsel to Hawk Systems in response to Spanakos's claims. Attorneys Bruce Rosetto and Amy Quintana were the Greenberg attorneys who handled the representation.  The law firm, Rosetto, and Quintana will be collectively referred to in this opinion as the "GT Defendants."

Between 2010 and 2012, Spanakos filed multiple lawsuits related to the governance of Hawk Systems, including the instant derivative action.

### *The Instant Lawsuit*

Spanakos filed this derivative action in 2010.  After numerous amendments, Spanakos settled on his operative complaint, bringing derivative claims against over 60 defendants, including the GT Defendants.

### *The Motions for Summary Judgment*

In early 2016, the GT Defendants filed two motions for summary judgment: (1) a motion for summary judgment on the ground that Spanakos failed to satisfy Delaware's demand/futility requirement as a prerequisite to bringing a derivative action, in that he failed to make a proper demand upon the board to pursue litigation and failed to show that such a demand would have been futile; and (2) a motion for summary judgment based on various other grounds.

### *The Proposal for Settlement*

Six days after serving the motions for summary judgment, the GT Defendants served their proposal for settlement on Spanakos, offering $500,000 to resolve, among other things, "all claims for damages brought against them in this Action" and "any claims that could have been brought in this Action."  The proposal for settlement apportioned the offer so that the entire $500,000 would be paid by Greenberg, with Rosetto and Quintana each paying nothing.

The non-monetary conditions of the proposal were: (1) delivery of the attached release signed by Spanakos in his capacity as a putative derivative plaintiff on behalf of Hawk Systems; and (2) delivery of a stipulation of voluntary dismissal with prejudice, which would be "approved by the Court to the extent required by law."

Spanakos did not accept the proposal for settlement.

### *Spanakos's Unsuccessful Attempt to*
### *Realign Hawk Systems as a Plaintiff*

Meanwhile, in 2015, Spanakos moved to realign Hawk Systems as the plaintiff in the derivative case, asserting that he was the majority shareholder and had the power to direct Hawk Systems to take over the action. The trial court stayed the case so that Delaware's Chancery Court could determine whether Spanakos was the majority shareholder.

The Delaware Chancery Court ultimately entered judgment against Spanakos on his request for a declaration that he was the majority shareholder of Hawk Systems. The court found that the stock ledger was "in shambles" and that the court could not "conclude on this record that Spanakos is the majority stockholder of Hawk Systems." *See In re Hawk Sys., Inc.*, No. 2018-0288-JRS, 2019 WL 4187452 at *8–*9 (Del. Ch. Sept. 4, 2019). Thus, Spanakos was unable to realign Hawk Systems as the plaintiff in the instant action, so the claims proceeded derivatively.

### *Final Summary Judgment*

In 2020, after the Delaware proceedings concluded, the trial court granted the GT Defendants' motion for summary judgment based on Spanakos's failure to satisfy the prerequisites for bringing a derivative action. The court denied the GT Defendants' other motion for summary judgment as moot. The court entered a final judgment of dismissal, reserving jurisdiction on the issue of attorney's fees and costs.

### *Spanakos Appealed the Summary Judgment While the*
### *GT Defendants Pursued Attorney's Fees*

Spanakos appealed the final summary judgment to this court, while the GT Defendants pursued their claim for attorney's fees and costs.

In November 2020, the GT Defendants moved to determine their entitlement to attorney's fees and costs pursuant to their offer of judgment, arguing that their offer was made in good faith and in compliance with section 768.79, Florida Statutes (2020), and Florida Rule of Civil Procedure 1.442. The GT Defendants also moved for taxable costs pursuant to section 57.041, Florida Statutes (2020).

In February 2021, at a hearing, the trial court[1] ruled that the GT Defendants were entitled to attorney's fees based on the proposal for settlement. Spanakos argued that: (1) the proposal for settlement was ambiguous because it was made to him as a derivative plaintiff and it failed to make the offer to the remaining shareholders; and (2) the proposal for settlement was made in bad faith because it represented only 2% of the $22 million in damages.

The trial court ruled that there had been "a proper proposal for settlement." After the hearing, the trial court entered an order finding that the GT Defendants were entitled to recover the reasonable attorney's fees and costs that they incurred from the date of their proposal.

In February 2022, this court per curiam affirmed the final summary judgment in the derivative case.

### *Proceedings in the Circuit Court to*
### *Determine the Amount of Fees and Costs*

Following the affirmance of the summary judgment, the GT Defendants filed a memorandum of law in the circuit court in support of their requested award of $1,183,744 in attorney's fees and $74,119.53 in costs.

Spanakos filed written objections to the GT Defendants' claim for fees and costs. He argued in relevant part that the amount sought was excessive because it included (1) time spent for duplicated work, (2) block billing, (3) time spent for secretarial tasks, (4) time allocated as redactions, (5) time spent communicating with the client, and (6) unnecessary expert fees. Spanakos also submitted detailed line-by-line objections for each of the legal bills.

In total, Spanakos did not challenge $713,956 in fees and $41,523.53 in costs, but objected to $408,956.50 in fees and $32,594 in costs. As to costs, Spanakos objected to a claim for $32,594 for "expert fees."

At an evidentiary hearing on the amount of fees and costs, the GT Defendants introduced their invoices, time entries, and other exhibits. The GT Defendants also called two witnesses in support of their motion: (1) Attorney Sashi Bach, a partner at the law firm Boies Schiller Flexner ("Boies Schiller") and one of the lead attorneys on the case for the GT Defendants; and (2) Fred Hazouri, a retired circuit and appellate judge. By

---

[1] Circuit Judge Glenn Kelley ruled on the entitlement issue; Circuit Judge Bradley Harper presided over the amount phase in the case.

contrast, Spanakos called no witnesses and did not challenge the hourly rates charged by the defense attorneys.

Attorney Bach testified that in a "case of this magnitude and complexity, we often have teams of more than one attorney handling it." Bach denied that the firm billed time for secretarial work, explaining that she would not have "billed for filing or copying or things of that nature." Although Bach conceded that sometimes a secretary can handle scheduling matters, she explained that "most scheduling issues required the attention of an attorney because of the sheer number of parties involved and the substance of objections that were often lodged by the Plaintiff to various hearings or depositions proceeding." She explained: "Unfortunately, it was one of those cases where almost nothing could be agreed between counsel. Even the simple act of setting a hearing [was] usually met with opposition."

Former Judge Hazouri testified as an expert witness for the GT Defendants. He stated that the GT Defendants' entire fee claim was "reasonable and necessary for the type of litigation that was involved here." He did not see any unreasonable duplication of work in his review of the time records, adding that a case like this would not customarily be handled by a single attorney.

On the issue of block billing, Hazouri opined that in the instances where Spanakos objected, the time entries were sufficiently specific to evaluate the overall reasonableness of the time spent for those tasks cumulatively. Similarly, he indicated that the redacted time entries were "adequately described," because the entries provided enough description "to understand what was taking place."

Hazouri further indicated that the attorney time billed on scheduling matters was reasonable under the circumstances. Tasks like setting up depositions would have required discussions with opposing counsel and "more lawyer involvement," given the "degree of friction" and "lack of cooperation" on both sides. He added: "It's not simply just having a secretary call the other secretary to see whether there was a time available. It would be . . . much more complicated than that."

Finally, Hazouri testified that the time billed for attorney-client communications was appropriate in this case, given the serious allegations against the GT Defendants. He explained that in this kind of case, unlike some other cases where client involvement or client knowledge "might not be very important," attorney-client communication "would be very important."

### Orders on Fees and Costs

After the hearing, the trial court entered an order awarding Greenberg the entirety of its requested attorney's fees and costs.[2] The trial court concluded that "all of the applicable factors [militate] in favor of granting the attorneys' fee award requested by [Greenberg], and that the entirety of the attorneys' fees, both in time spent and in the rates charged, were reasonable and appropriate."

The trial court found that: (1) the case involved novel and difficult questions; (2) the fees charged were customary in the locality for similar legal services; (3) Spanakos sought millions in damages and the results obtained for the GT Defendants were "outstanding"; (4) the relationship between the Boies Schiller attorneys and Greenberg was longstanding; and (5) the experience, reputation, and ability of the lawyers were "outstanding."

The court also awarded Greenberg its taxable costs in full, determining that the expert fees it sought were "appropriate."

The trial court entered a final judgment in favor of Greenberg for attorney's fees and costs totaling $1,259,470.86, plus post-judgment interest.

### Overview of the Parties' Arguments on Entitlement

Spanakos contends that the proposal for settlement failed to comply with Florida law because it did not address the relevant conditions involved in a shareholder derivative lawsuit. He argues that the proposal was defective because it was directed at him "in his representative capacity yet no provisions addressed the authorization to accept such an offer on behalf of Hawk and its shareholders; no provision addressed the allocation of the settlement proceeds and no offer was made to Hawk[.]" He also asserts that the proposal was made in bad faith because: (1) it offered only about 2% of the $22 million in damages suffered by the shareholders; (2) it did not include any funds being offered by Rosetto or Quintana; and (3) the GT Defendants knew there was no way he could figure out how to allocate the proceeds where the shareholder list was in shambles.

The GT Defendants respond that the trial court correctly determined their offer of judgment complied with section 768.79 and rule 1.442. The

---

[2] Although the fee motion was filed by the GT Defendants collectively, the award went to Greenberg "as the entity that paid the fees and costs."

GT Defendants maintain that a proposal for settlement in a derivative action need not list court approval as a condition of settlement, is properly served on a derivative plaintiff, and need not allocate funds between nonparticipating shareholders or carve out funds for the derivative plaintiff. The GT Defendants further posit that the trial court did not abuse its discretion by finding the proposal for settlement to have been made in good faith where (1) the $500,000 offer was an objectively significant sum of money and accounted for the weaknesses in Spanakos's case, and (2) not all parties offering settlement must offer funds.

### *The Proposal Complied with Section 768.79 and Rule 1.442*

Generally, a party's entitlement "to receive attorney's fees and costs pursuant to section 768.79 and rule 1.442 is reviewed de novo." *Pratt v. Weiss*, 161 So. 3d 1268, 1271 (Fla. 2015).

Under Florida's offer of judgment statute, "if a defendant serves an offer which is not accepted by the plaintiff, and if the judgment obtained by the plaintiff is at least 25 percent less than the amount of the offer, the defendant shall be awarded reasonable costs, including investigative expenses, and attorney's fees" incurred from the date the proposal was served. § 768.79(6)(a), Fla. Stat. (2015).

"[A]n offer that complies with section 768.79 and Rule 1.442 creates a 'mandatory right' to collect attorneys' fees." *Anderson v. Hilton Hotels Corp.*, 202 So. 3d 846, 856 (Fla. 2016). "[O]nce an offer of judgment has been made and rejected and a judgment of no liability has been entered, the defendant has a right to an award of attorney's fees unless the offer was found to have been made in bad faith." *Fla. Gas Transmission Co. v. Lauderdale Sand & Fill, Inc.*, 813 So. 2d 1013, 1014 (Fla. 4th DCA 2002).

Under section 768.79(2), an offer of judgment must:

(a) Be in writing and state that it is being made pursuant to this section.

(b) Name the party making it and the party to whom it is being made.

(c) State with particularity the amount offered to settle a claim for punitive damages, if any.

(d) State its total amount.

§ 768.79(2), Fla. Stat. (2015).[3]

Rule 1.442 contains the same basic requirements set forth in section 768.79(2). In addition, rule 1.442 requires that the proposal state with particularity "any relevant conditions" and "all nonmonetary terms," and that a "joint proposal shall state the amount and terms attributable to each party." Fla. R. Civ. P. 1.442(c)(2)(C), (D) & 1.442(c)(3) (2015).

"The rule does not demand the impossible. It merely requires that the settlement proposal be sufficiently clear and definite to allow the offeree to make an informed decision without needing clarification." *State Farm Mut. Auto. Ins. Co. v. Nichols,* 932 So. 2d 1067, 1079 (Fla. 2006).

Here, the GT Defendants' proposal complied with all the requirements of section 768.79 and rule 1.442, including the form, content, and particularity requirements.

Spanakos's objections to the proposal for settlement are without merit. His challenges to the proposal for settlement seek to impose requirements beyond those required by Florida law.

A. The Proposal for Settlement Was Not Invalid Simply Because the Settlement Would Have Required Subsequent Court Approval

Spanakos objects that he would have needed the court's permission to allocate funds to each shareholder. This argument is not a basis for reversal.

Spanakos did not preserve the argument that the proposal for settlement needed to list court approval as a condition of settlement, as this argument was not presented to the trial court.

In any event, while settlements in derivative shareholder actions require court approval, *see* § 607.0745(1), Fla. Stat. (2022), court approval is a post-agreement ratification of the settlement, not a condition of settlement. *See Berges v. Infinity Ins. Co.,* 896 So. 2d 665, 672 (Fla. 2004) (holding that "an offer to settle is not invalid simply because there is a requirement of subsequent court approval"); *Bateski By & Through Bateski v. Ransom,* 658 So. 2d 630, 632 (Fla. 2d DCA 1995) (explaining that court approval is "not an essential term" of a settlement but rather is a contingency that does not affect the proposal).

---

[3] Section 768.79 contains other requirements not relevant to this appeal.

8

B. Shareholder Derivative Lawsuits are Not Exempt from Section 768.79, so a Proposal for Settlement is Properly Served on a Derivative Plaintiff

We reject Spanakos's contention that the proposal was invalid because it was directed to him "in his representative capacity" and he "could not legally accept the proposal."

Derivative lawsuits are not exempt from section 768.79. By its plain terms, section 768.79 applies to "any civil action for damages" and does not contain an exception for shareholder derivative suits. § 768.79(1), Fla. Stat. (2015). Although rule 1.442 formerly prohibited the use of proposals for settlement in shareholder derivative actions, that prohibition was removed in a 1996 amendment to Rule 1.442. *Compare In re Amends. to Fla. R. Civ. Proc.*, 682 So. 2d 105, 106 (Fla. 1996) (adopting version of rule 1.442 that did not contain prohibition on sanction for rejecting proposal for settlement in a shareholder derivative suit), *with The Fla. Bar Re Amend. to Rules of Civ. Proc., Rule 1.442 (Offer of Judgment)*, 550 So. 2d 442, 444 (Fla. 1989) (prohibiting sanctions under rule 1.442 in a shareholder derivative suit).

Where the plain language of the statute states that it applies to *any* civil action for damages, a court cannot judicially exempt shareholder derivative suits from section 768.79. *See Oruga Corp. v. AT&T Wireless of Fla., Inc.*, 712 So. 2d 1141, 1143 (Fla. 3d DCA 1998) (holding that section 768.79 applies to class action representatives).

The proposal was appropriately directed to Spanakos in his capacity as a derivative plaintiff on behalf of the company. As explained above, Spanakos could have accepted the offer even though it was subject to court approval. Had Spanakos accepted the offer, the court would have then determined the identities of the nonparticipating shareholders and directed notice of the settlement to the nonparticipating shareholders for their potential objections at a fairness hearing. *See* § 607.0745(2), Fla. Stat. (2022); *see also Andrzejczyk v. Mitchell*, 2013 WL 7763390, at *2 (Fla. 15th Jud. Cir. Dec. 17, 2013) (approving settlement of a shareholder derivative action after holding a hearing to determine whether the settlement was "fair, reasonable and adequate").

C. A Proposal for Settlement Need Not Allocate Funds Among Nonparticipating Shareholders or Carve Out Funds for the Derivative Plaintiff

9

Spanakos next objects that the proposal for settlement was defective because it did not include a provision addressing the allocation of the settlement proceeds, as no provision addressed "which shareholder would receive what amount" or "the allocation of settlement funds made to Spanakos in his representative capacity."

As the GT Defendants argue, a proposal for settlement need not allocate funds between nonparticipating shareholders or carve out funds for the derivative plaintiff. "In a derivative action the recovery flows to the corporation, not to the derivative plaintiff individually." *Ginsberg v. Keehn*, 550 So. 2d 1145, 1147 n.2 (Fla. 3d DCA 1989). While a proposal for settlement "directed to multiple plaintiffs must specifically apportion the settlement offer among the plaintiffs," *Thompson v. Hodson*, 825 So. 2d 941, 949 (Fla. 1st DCA 2002), the nonparticipating shareholders are not *plaintiffs* in this case.

A defendant making a proposal for settlement to a *representative* plaintiff need not apportion the proposed settlement among the beneficiaries on behalf of whom the derivative plaintiff is acting. *See Dudley v. McCormick*, 799 So. 2d 436, 441 (Fla. 1st DCA 2001) ("A defendant in a wrongful death action need not apportion a proposed settlement among the estate and survivors on behalf of whom the personal representative is acting in order to comply with the requirements of section 768.79 and Florida Rule of Civil Procedure 1.442."). Accordingly, because the recovery obtained in a derivative action belongs to the corporation, not to the individual shareholders, it is not the defendants' responsibility to allocate settlement funds in a proposal for settlement.

To be sure, the court *may* "[o]rder the corporation to pay from the amount recovered in the derivative proceeding by the corporation the plaintiff's reasonable expenses" if "the plaintiff was successful in whole or in part." § 607.0746(1), Fla. Stat. (2022). However, the court's discretionary authority to award the plaintiff his reasonable expenses out of any recovery has nothing to do with the validity of a lump sum proposal for settlement in a shareholder derivative action. By default, any settlement funds secured by the derivative plaintiff and approved by the court would have flowed directly to the corporation. Nothing in section 768.79 or rule 1.442 prohibits a lump sum proposal to settle a shareholder derivative action.

Finally, any issues with the shareholder ledger do not affect the validity of the proposal, but rather would have been addressed at the court approval stage.

### *The Trial Court Did Not Abuse its Discretion in Finding that the Proposal for Settlement was Not Made in Bad Faith*

We conclude that the trial court was within its discretion to conclude that the GT Defendants' proposal for settlement was not made in bad faith.

"The offeree bears the burden of proving the offeror's proposal was not made in good faith." *Ruiz v. Policlinica Metropolitana, C.A.*, 260 So. 3d 1081, 1089 (Fla. 3d DCA 2018). A trial court's determination as to whether an offer of judgment was made in good faith is reviewed for an abuse of discretion. *Alexandre v. Meyer*, 732 So. 2d 44, 45 (Fla. 4th DCA 1999).

Whether a proposal for settlement was made in good faith is "determined by the subjective motivations and beliefs of the pertinent actor." *Matrisciani v. Garrison Prop. & Cas. Ins. Co.*, 298 So. 3d 53, 61 (Fla. 4th DCA 2020) (citation omitted). "Offers are not suspect merely because they are nominal." *State Farm Mut. Auto. Ins. Co. v. Sharkey*, 928 So. 2d 1263, 1264 (Fla. 4th DCA 2006). "Offers, nominal or otherwise, must bear a reasonable relationship to the amount of damages or a realistic assessment of liability." *Id.* Thus, "a minimal offer can be made in good faith if the evidence demonstrates that, at the time it was made, the offeror had a reasonable basis to conclude that its exposure was nominal." *Nants v. Griffin*, 783 So. 2d 363, 365 (Fla. 5th DCA 2001).

Here, a reasonable view of the evidence was that the $500,000 offer was more than adequate. It was a significant sum and accounted for the substantial weaknesses in Spanakos's case. The trial court did not abuse its discretion in concluding that the proposal for settlement was made in good faith.

The GT Defendants made their proposal after five years of litigation and significant discovery. At the time they served the proposal, they had filed two independent motions for summary judgment, and they had a high probability of prevailing on at least one of them. Even assuming that Spanakos could prove that the company suffered $22 million in damages, the GT Defendants had a reasonable basis to conclude that their exposure was nominal, given their significant—and ultimately meritorious—defense that Spanakos had failed to comply with Delaware's demand/futility prerequisite to bringing a derivative action.

Although Spanakos emphasizes that the GT Defendants had unsuccessfully moved to dismiss the lawsuit years earlier based on the argument that he had failed to satisfy the demand/futility prerequisites of a derivative case, this does not mean that the GT Defendants lacked a

reasonable basis to conclude that their exposure was nominal in light of their motion for summary judgment on a more fully-developed record.

Under these circumstances, Spanakos's claim that the proposal was made in bad faith because it represented only "2% of the actual losses to the shareholders" is unpersuasive, as courts have found similarly insubstantial offers to have been made in good faith. *See, e.g., Land & Sea Petroleum, Inc. v. Bus. Specialists, Inc.*, 53 So. 3d 348, 354 (Fla. 4th DCA 2011) (holding that offeree did not meet burden of proving that $500 proposal for settlement was made in bad faith where claimed damages were $300,000); *Tiara Condo. Ass'n v. Marsh USA, Inc.*, 697 F. Supp. 2d 1349, 1353 (S.D. Fla. 2010) ("Although Marsh's $70,000 offer of judgment was essentially nominal [where the claimed damages were $70 million], so too was the prospect of an adverse judgment against it given its significant, and ultimately meritorious, defenses.").

Spanakos's next argument, that the proposal was made in bad faith because it did not include funds from Rosetto or Quintana, is unsupported by law. Section 768.79 and rule 1.442 do not require that each defendant contribute funds to a joint settlement proposal. The proposal need only state the amount and terms attributable to each party, which the proposal did by indicating that Greenberg would pay the entire sum.

Finally, there is no merit to Spanakos's suggestion that the GT Defendants "unreasonably refused to furnish information necessary to evaluate the reasonableness of the proposal." Fla. R. Civ. P. 1.442(h)(2)(D). Spanakos largely rehashes the argument that he "could not reasonably be expected to know how to allocate the proposed settlement funds" because the stock ledger—which he claims was prepared by the GT Defendants— was in shambles. The flaw in this argument is that Spanakos did not need to know "who the legitimate shareholders were" to evaluate whether the proposal was reasonable. The reasonableness of the proposal turned on whether it bore a sensible relationship to the amount of damages or to the likelihood of liability. Spanakos was aware of the damages he sought in the lawsuit and the GT Defendants' motions for summary judgment gave him sufficient information to realistically assess the likelihood of prevailing and the probable extent of the defendants' liability.

### The Trial Court Did Not Abuse Its Discretion in its Award of Fees and Costs

"We review the trial court's determination as to the amount of attorney's fees and costs for abuse of discretion." *Webber for Keitel v. D'Agostino*, 251 So. 3d 188, 191 (Fla. 4th DCA 2018). Factual findings must be supported

by competent, substantial evidence, while legal rulings are reviewed de novo. *Id.*

Florida courts apply the lodestar method—multiplying the number of hours reasonably expended by a reasonable hourly rate—in determining a reasonable fee. *Fla. Patient's Comp. Fund v. Rowe*, 472 So. 2d 1145, 1150 (Fla. 1985). "To reach the 'lodestar figure,' the trial court must consider the factors listed in Rule 4–1.5 of the Rules Regulating the Florida Bar." *22nd Century Props., LLC v. FPH Props., LLC*, 160 So. 3d 135, 142 (Fla. 4th DCA 2015).

The factors relevant to this appeal include: (1) the time and labor required, including the novelty and difficulty of the question involved; (2) the customary fee in the locality; (3) the amount at issue and results obtained; (4) the nature and length of the relationship with the client; and (5) the experience and ability of the attorneys. *Rowe*, 472 So. 2d at 1150.

A. Objection to Alleged Duplicated Work

Spanakos objects that the fee award included duplicative time billed and time spent for internal conferences.

"Duplicative time charged by multiple attorneys working on the case are generally not compensable." *N. Dade Church of God, Inc. v. JM Statewide, Inc.*, 851 So. 2d 194, 196 (Fla. 3d DCA 2003). However, the mere fact that multiple lawyers collaborated on a particular task "does not necessarily mean that their work was duplicative." *Mitchell v. Mitchell*, 94 So. 3d 706, 708 (Fla. 4th DCA 2012).

"An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." *Johnson v. Univ. Coll. of Univ. of Ala. in Birmingham*, 706 F.2d 1205, 1208 (11th Cir. 1983). Thus, "a reduction is warranted only if the attorneys are *unreasonably* doing the *same* work." *Id.* For example, where two lawyers entered "the same amount of time, describing the same exact service," a federal district judge concluded that such "generic carbon copy entries" were redundant and thus not recoverable. *Beishir v. Chase Home Fin. LLC*, No. 8:07-CV-65-T-27MAP, 2008 WL 533881, at *1 (M.D. Fla. Feb. 27, 2008).

Still, "time spent in attorney conferences is generally compensable for each participant." *Am. Charities for Reasonable Fundraising Regul., Inc. v. Pinellas Cnty.*, 278 F. Supp. 2d 1301, 1315 (M.D. Fla. 2003). This is because "attorneys must spend at least some of their time conferring with

colleagues, particularly their subordinates, to ensure that a case is managed in an effective as well as efficient manner." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1337 (D.C. Cir. 1982). Also, the delegation of work to attorneys who bill at a lower rate than lead counsel can reduce the overall amount of attorney's fees incurred. *Williams v. R.W. Cannon, Inc.*, 657 F. Supp. 2d 1302, 1311 (S.D. Fla. 2009).

Here, the trial court did not abuse it discretion in finding that, due to the nature and complexity of this high-stakes litigation, the billing entries objected to as duplicative "were appropriate under the circumstances." Hazouri gave unrebutted testimony that he did not see unreasonable duplication of work in his review of the time records.

The collaboration here reflected the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation. The trial court found it was "appropriate and reasonable" for the attorneys to conduct internal conferences in the course of defending this complex action. Although Spanakos complains that a partner and an associate "both drafted discovery requests, conferred with the client, and scheduled depositions," our examination of the time records demonstrates that the time entries were not "generic carbon copies" but rather were consistent with a partner delegating to an associate and reviewing the work.

B. <u>Objection to Block Billing</u>

Spanakos complains that the lawyers for the GT Defendants "engaged in significant block billing."

We agree with the Second Circuit that "block-billing—the grouping of multiple tasks into a single billing entry—is not per se unreasonable." *Hines v. City of Albany*, 613 F. App'x. 52, 55 (2d Cir. 2015). "As a general proposition block billing is not prohibited so long as the Court can determine from the time entry the services that were performed." *Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*, No. 4:08-CV-355-MCR-GRJ, 2018 WL 4381294, at *6 (N.D. Fla. May 29, 2018).

"[T]he mere fact that an attorney has included more than one task in a single billing entry is not, in itself, evidence of [impermissible] block-billing. When those tasks are intertwined, including a thorough description of the activities performed clarifies, rather than obscures, the record." *Williams*, 657 F. Supp. 2d at 1312. Thus, block billing does not warrant a reduction where "the entries are so well-detailed and informative that the lack of segregation does not interfere at all with the Court's task to determine the reasonableness of the time spent," and "there are no

objectionable tasks that need to be eliminated from the computation of counsel's hours." *Gay v. Brencorp, Inc.*, No. 3:09-CV-1002-J-JBT, 2013 WL 2683156, at *3 (M.D. Fla. June 11, 2013).

By contrast, improper block billing occurs when the time entries are "insufficiently detailed." *Cousins v. Duprey*, 325 So. 3d 61, 76 (Fla. 4th DCA 2021). For example, in *Moore v. Kelso-Moore*, 152 So. 3d 681, 682 (Fla. 4th DCA 2014), we noted that block billing "made it impossible to determine the reasonableness of the hours expended on several matters."

Here, competent, substantial evidence supports the trial court's findings that "[t]he invoices here were sufficiently detailed to apprise the Court . . . as to what the time was billed for" and that the time spent "was reasonable for the work that was being performed." Hazouri testified that the time entries were sufficiently specific to evaluate the overall reasonableness of the time spent for those tasks cumulatively. Indeed, a review of the two specific time entries cited in the initial brief as examples of improper block billing—a 4.1 hour entry[4] from Attorney Bach on June 14, 2016, and a 6.4 hour entry[5] from her associate on the day before— shows that the entries were well-detailed, did not include any non-compensable tasks, and mostly dealt with intertwined tasks related to preparing for the summary judgment hearing. The trial court did not abuse its discretion in declining to reduce the fee award based on certain instances of block billing.

C. Objection to Alleged Secretarial Tasks

Spanakos complains that the trial court awarded time for secretarial tasks.

"[T]asks of a clerical nature are not compensable as attorney's fees." *Mobley v. Apfel*, 104 F. Supp. 2d 1357, 1360 (M.D. Fla. 2000). For example, in *Scelta v. Delicatessen Support Servs., Inc.*, 203 F. Supp. 2d 1328, 1334 (M.D. Fla. 2002), the court did not award attorney's fees for "a substantial amount of claimed time that was spent doing clerical and

---

[4] The entry stated: "Work on materials for judge for summary judgment hearings; prepare for hearings; deposition scheduling."

[5] The entry stated: "Corresponded with S. Bach re: outstanding research and preparation of PowerPoint presentations for use at upcoming summary judgment hearing; drafted same; reviewed motion for summary judgment filed by co-defendant."

secretarial work, such as gathering materials, copying them, mailing them and refiling them."

We are aware that some courts have said that "work related solely to scheduling of mediation and depositions generally is clerical or secretarial." *For Play Ltd. v. Bow to Stern Maint., Inc.*, No. 05-22002-CIV, 2006 WL 3662339, at *8 (S.D. Fla. Nov. 6, 2006); *see also Sines v. Kessler*, 343 F.R.D. 311, 322 (W.D. Va. 2022) (describing "scheduling depositions" as a "purely clerical" task).

But other courts have concluded that attorney time spent on scheduling is not necessarily clerical in nature. *See Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1256 (D. Kan. 2017) ("It is not clerical to email opposing counsel regarding scheduling, the subject of phone conferences, and legal issues in the case. . . . It is not clerical to email the client to set up depositions and subpoenas."); *cf. also Dave' v. Bd. of Trs. of S. Ill. Univ., Carbondale*, No. 3:18-CV-02122-GCS, 2022 WL 575614, at *6 (S.D. Ill. Feb. 25, 2022) (ruling that fees imposed as a sanction "would include the attorney's fees for the scheduling" of the plaintiff's deposition, necessitated by the cancellation of his earlier deposition).

Similarly, some courts have suggested that time spent on exhibit preparation is clerical in nature. *See, e.g., Knight v. Paul & Ron Enters., Inc.*, No. 8:13-CV-310-T-36EAJ, 2015 WL 2401504, at *8 (M.D. Fla. May 19, 2015) (excluding as "clerical" a paralegal's time spent "preparing trial binders and exhibits").

A more nuanced view is that "[i]t is not clerical to determine the exhibits necessary for trial for purposes of an exhibit list." *Fox*, 258 F. Supp. 3d at 1257. Still, time spent "collecting, scanning, and labeling" in the course of preparing exhibits is a purely clerical task. *Id.*

Here, the trial court did not abuse its discretion in concluding that attorney time spent on scheduling and exhibit preparation was compensable. Hazouri testified that tasks like setting up depositions would have required lawyer involvement and discussions with opposing counsel, given the "degree of friction" and "lack of cooperation" on both sides. He added that this was not a case where one secretary could simply "call the other secretary to see whether there was a time available." Likewise, Attorney Bach testified that "most scheduling issues required the attention of an attorney because of the sheer number of parties involved and the substance of objections that were often lodged by the Plaintiff to various hearings or depositions proceeding."

Spanakos also objects that attorney time was spent on preparing exhibits. However, it is not clerical for an attorney to determine the exhibits necessary to advance the legal argument in a motion. Preparation of exhibits is often inextricably intertwined with preparation for a hearing or trial. While it is true that a vague time entry such as "preparation of exhibits" could theoretically include clerical tasks like copying, scanning, or labeling, Attorney Bach flatly denied that her firm would have billed for secretarial tasks like "filing or copying or things of that nature."

The record evidence supports the trial court's finding that the "billing for scheduling and other things which could sometimes be secretarial tasks were not so in this case, because of the nature and complexity of the case, the number of defendants involved, and the testimony that those complexities required" an attorney's involvement.

D. Objection to Redactions

Spanakos complains that a proper analysis of the billing records was "thwarted" because the GT Defendants "redacted significant records without explanation."

In *Oxford Asset Management, Ltd. v. Jaharis*, 297 F.3d 1182, 1197 (11th Cir. 2002), the Eleventh Circuit held that the trial court did not abuse its discretion in finding that counsel's redacted time entries demonstrated that "the time claimed in these entries was spent on this matter, either performing legal research or discussing the case with unidentified individuals." Thus, where "there is no indication that fee counsel has failed to exercise billing judgment, the total amount of time spent on 'research' is reasonable, and the number of entries that fail to contain details about what research is being performed is relatively small, it is within the [trial] court's discretion to include those hours in the award." *Id.*

Here, the trial court did not abuse its discretion by including the partially-redacted time entries in the fee award. The GT Defendants redacted only limited portions of 16 time entries. The redactions were made because the descriptions "included the attorney's strategy or mental impressions." The lightly-redacted time entries mostly pertained to the specific legal issue being researched. And Hazouri testified that even with the redactions, the entries were "adequately described."

Because there was no indication that fee counsel failed to exercise billing judgment, the total amount of time spent on legal research was reasonable, and the number of redacted entries was small, it was well

within the trial court's discretion to include the partially-redacted time entries in the award.

E. Objection to Client Communications

Spanakos complains that "BSF time sheets reflected numerous entries reflecting communications with its client."

The test for awarding fees for attorney-client communications is whether the time spent was "reasonably necessary." *Guthrie v. Guthrie*, 357 So. 2d 247, 248 (Fla. 4th DCA 1978). "Work done that is not reasonably necessary but performed to indulge the eccentricities of the client should more properly be charged to the client rather than the opposing party." *Id.* Thus, in *Guthrie*, we found "no justification for the expenditure of twenty hours conference time with the client for an appeal" in a family law case involving a client who was "very emotional and persistent." *Id.*

By contrast, necessary attorney-client communications are compensable in a fee award. *See SunTrust Bank v. Ruiz*, No. 14–21107–CIV, 2016 WL 4006665, at *6 (S.D. Fla. Mar. 7, 2016).

Here, the trial court did not abuse its discretion in awarding time for attorney-client communications. Such communications in this case were reasonably necessary. The communications were not the result of the GT Defendants' "eccentricities," and the work was not necessitated by the clients' own behavior. This was a complex corporate case involving accusations of fraud arising out of the GT Defendants' representation of a public company, not a family law case like *Guthrie* involving a "very emotional" client who needed hand-holding.

The Florida Bar Rules require attorneys to keep clients informed regarding the status of the representation. Attorney Bach testified that the level of attorney-client communication "was typical given the magnitude and complexity of this case." And Hazouri testified that this was the kind of case where attorney-client communication would be "very important." Thus, the record contains competent, substantial evidence to support the award of fees for attorney-client communications.

F. Reasonable Client Standard

While it is true that a court must consider "what a reasonable, paying client would be willing to pay" in light of all relevant case-specific variables, *see Alexandre v. Millenia Hous. Mgmt., Ltd.*, No. 19-80612-CIV, 2020 WL

9458895, at *2 (S.D. Fla. Mar. 4, 2020), the record does not support Spanakos's argument that the attorney's fees exceeded what a reasonable client would be willing to pay. Indeed, a law firm like Greenberg would have been uniquely qualified to scrutinize the legal bills it received from Boies Schiller.

G. Costs for Expert Witness Fee

In one sentence, Spanakos attacks the award of an expert witness fee without making any legal argument. Such a conclusory sentence fails to sufficiently present the issue for appellate review.

As the Florida Supreme Court once observed, "when a decree of the trial court is brought . . . on appeal the duty rests upon the appealing party to make error clearly appear." *Lynn v. City of Fort Lauderdale,* 81 So. 2d 511, 513 (Fla. 1955). To this end,

> [a]n appellant does not discharge this duty by merely posing a question with an accompanying assertion that it was improperly answered in the court below and then dumping the matter into the lap of the appellate court for decision. Under such circumstances it must be held . . . that [the appellate court is] under no duty to answer the question.

*Id.*; *see also Hammond v. State*, 34 So. 3d 58, 59 (Fla. 4th DCA 2010) ("Claims for which an appellant has not presented any argument, or for which he provides only conclusory argument, are insufficiently presented for review and are waived.").

## Conclusion

For the foregoing reasons, we affirm the final judgment in its entirety.

*Affirmed.*

CONNER and FORST, JJ., concur.

* * *

**Not final until disposition of timely filed motion for rehearing.**

19